**FIRST NATIONAL BANK, COLFAX, Iowa, Appellant,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, Appellee.**

**No. 63458.**

Supreme Court of Iowa.

Aug. 27, 1980.

Ben C. Clayton and Roger D. Williams of Diehl, Clayton, Cleverley & Knopf, Newton, for appellant.

L. W. Rosebrook of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, for appellee.

LARSON, Justice.

The First National Bank sustained a loss in its dealings with a customer named Charles Gerhart. The bank, claiming the loss was covered by a blanket bond, brought suit against the Hartford Accident and Indemnity Company. The trial court ruled that the loss was not covered by the terms of the bond and, in any event, the bank had failed to show it had relied upon the document in question when it entered into the loan transaction. We affirm the trial court.

On May 1, 1972, Gerhart, a contractor, obtained a $40,000 loan from the bank and secured it with equipment and an account receivable from Maplenol Construction

Company. The loan was due June 1, 1972. Thereafter, two additional loans were obtained: a five-day note for $7000 on June 15 and a two-day note for $4500 on June 26. The last two loans were consolidated on November 1, 1972, and were due in thirty days. As of January 15, 1973, none of the loans had been paid. On that date, the loan transaction which gave rise to this action was entered into, consolidating all of Gerhart's past-due loans.

On July 13, 1972, after the $40,000 loan and the two additional loans were obtained, but before the January 15, 1973, consolidation, Gerhart negotiated a settlement with Maplenol under his contract with it and received the proceeds of the settlement. None of the proceeds was paid to the bank despite the fact that the account receivable from Maplenol stood as security for Gerhart's loans. The settlement payment, totaling $45,079.86, was paid by Maplenol with two certified checks. Check number 105 for $40,257.46 was payable jointly to Gerhart and the Internal Revenue Service; the balance of $4822.40 was payable to Gerhart in check number 106.

The bank constantly pressured Gerhart for payment. To stave off the bank, Gerhart produced a photocopy of a photocopy of the settlement agreement with Maplenol, which had been altered to read $9 5,079.86. The bank wanted more proof concerning the amount of money coming to Gerhart under the settlement so it asked for copies of the checks. Gerhart brought the bank a photocopy of check number 105, which contained a handwritten notation that check number 106 was for $5 4,822.40. Gerhart told the bank that he had sent both checks to the IRS but that number 106 would soon be returned. The bank's "further insistence for assurances" prompted Gerhart to show the bank a poor quality thermofax copy of a photocopy of check number 106 altered to read $5 4,822.40. The alteration, which was very crude, is not disputed. The bank wrote the IRS on September 25, 1972, enclosing copies of its copies of the checks, inquiring about the delay and asking to be kept informed. The IRS wrote Gerhart that they had received check number 105

but had no record of "another check of some $54,000." A copy of this letter was given to the bank by Gerhart, but Gerhart maintained the $54,000 check existed and was in the hands of the IRS. This prompted the bank to contact the Omaha bank which had issued the two Maplenol checks. It indicated that check number 106 was in the amount of $4822.40, not $54,822.40, and that it had been immediately deposited in Gerhart's account with the Omaha bank.

The bank confronted Gerhart with the foregoing information and he disavowed any knowledge of the discrepancies. Gerhart responded that if he had received only $45,000, then $50,000 more was to be forthcoming from Maplenol under the settlement agreement. Despite this background, the bank consolidated Gerhart's total indebtedness on January 1, 1973. This note was again secured by the $50,000 presumably due from Maplenol and the rolling stock of the company, as was the earlier note. However, for the first time the bank required that an additional $82,000 in separate accounts receivable be pledged. At no time before this loan did the bank contact Maplenol to determine the truth behind the discrepancies. However, eleven days after making the loan the bank received authorization from Gerhart to inquire into the validity of his accounts receivable, including the Maplenol one. It appears they did not actually inquire about the matter until early April, when Maplenol's attorney informed them that nothing more was owed Gerhart. On May 21, 1973, the bank submitted a claim with its insurer.

The bank's claim was based upon "Clause (E)" of its banker's blanket bond. That clause provided in part:

The Underwriter . . . agrees with Insured . . . to indemnify and hold harmless the Insured for:

. . . . .

(E) Loss (1) through the Insured's having, in good faith and in the course of business, . . . purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, ex-

tended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been

    (a) counterfeited or forged as to the signature of any [party], or

    (b) raised or otherwise altered or lost or stolen

.    .    .    .    .

Securities, documents or other written instruments shall be deemed to mean

    (a) original (including original counterparts) negotiable or nonnegotiable agreements in writing, other than as set forth in (b) and (c) below, having value which value is, in the ordinary course of business, transferable by delivery of such agreements with any necessary endorsement or assignment;

.    .    .    .    .

Actual physical possession of such securities, documents or other written instruments by the Insured . . . is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such securities, documents or other written instruments.

.    .    .    .    .

Mechanically reproduced facsimile signatures are treated the same as handwritten signatures.

The trial court ruled against the bank's claim on three grounds: (1) that the bank did not rely on the settlement agreement in extending the credit on January 15, 1973; (2) that the photocopy of the photocopy of the settlement agreement did not fall within "securities, documents or other written instruments" according to the contractual definition of those terms; and (3) that the cause of the loss was not the bank's reliance on the settlement agreement but rather Gerhart's inability to repay the loans already delinquent.

The bond provided coverage for the bank if it, through having "in good faith and in the course of business," sustained a loss by reason of having "given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments" which have been "raised or otherwise altered." The language quoted raises two issues: (1) did the bank act "in good faith" and "on the faith of" the settlement agreement; and (2) was that agreement encompassed by "securities, documents or other written instruments" under the bond? We believe both questions must be resolved against the bank.

### I.  *The bank's reliance.*

█  The trial court found that the bank did not extend credit on the faith of the settlement agreement. The only evidence found to be supportive of the bank's reliance on the document was the testimony of its vice president, Mr. Stinson, that he believed Gerhart still had $50,000 coming under the agreement. Contrary evidence, however, showed that the agreement itself specifically provided that Gerhart "has been paid for all labor and materials performed and furnished on the above named project . . . and it is further agreed that no further money is to be paid [to Gerhart] . . . ." The trial court also found strong circumstantial evidence indicated a lack of reliance by the bank:

> When Mr. Stinson [the banker] made his inquiries of the IRS and the Omaha bank regarding Check No. 106 [which had been raised from $4,822.40 to $54,822.40] . . . and learned of the material misrepresentations which Gerhart had made to him, all doubt should have been erased as to the actual amount of the Maplenol settlement. If after that Stinson chose to believe Gerhart still had $50,000 coming from Maplenol, it could only have been because Gerhart convinced him of that through his subsequent misrepresentations, rather than because of the termination agreement. This court declines to believe that any reasonable person, much less a banker of Mr. Stinson's stature and experience, could possibly have given any credence to the altered figures in the termination agreement, given the irreconcilable conflicts and contradictions in

the information he had available to him after learning what he learned from the IRS and the Omaha bank.

Substantial evidence supports that conclusion and it is therefore binding upon this court on appeal. Iowa R.App.P. 14(f)(1).

## II. *The settlement agreement as a covered instrument.*

■ There is another reason the ruling of the trial court was correct. This agreement was not within the bond's definition of "securities, documents or other written instruments." "Clause E" is a standard provision of virtually all banker's blanket bonds. *Annot., What are "Securities, Documents or Other Written Instruments" Within Terms of Bankers' Blanket Bond Insuring Losses From Counterfeiting or Forgery*, 38 A.L. R.3d 1437 (1971). However, the parties agree there is little case authority as to the interpretation of its language. In the past, courts gave a very broad construction to "securities, documents or other written instruments" as used in the bond. *Id.* at 1439. This broad construction resulted in a 1969 amendment to the standard form, Wisner, *Banker's Blanket Bond, Clause E: Recent Decisions*, 39 Ins. Counsel J. 305, 307 (1972), which defined "securities, documents or other written instruments" as

> original (including original counterparts) negotiable or non-negotiable agreements in writing, other than as set forth in (b) and (c) below, having value which value is, in the ordinary course of business, transferable by delivery of such agreements with any necessary endorsement or assignment; . . . .

The only case cited in the briefs which discusses the meaning of the standard clause, as amended to add the definition, is *Union Investment Co. v. Fidelity & Deposit Co.*, 549 F.2d 1107 (6th Cir.1977). In that case, certificates of mortgage insurance authorizing loan disbursements, known as FHA Forms 2403, were forged and then furnished to a lender. The questions addressed by the court were whether the forms had "value" within the terms of the coverage, and whether an instrument, in order to be covered, had to be "commercial paper" in its ordinary meaning. Aided in part by the general principle that ambiguous language in an insurance contract is to be liberally construed in favor of the insured and against the insurer, the court resolved the issues against the bonding company. That case is clearly distinguishable because the court did not discuss the interpretations of "original" or "original counterpart" under the clause, which we deem to be the pivotal issues of interpretation in this case.[1]

■ We agree that, as a general rule, ambiguous terms in an insurance contract must be resolved against the insurer. But no amount of liberal construction of "original" or "original counterpart" will allow this document to fall within the definition. It was clearly not an "original." And an "original counterpart," we believe, means one in which the writing in question is produced simultaneously with the original through carbon paper or other means. This is consistent with the view of at least one commentator, who has said that the purpose of the 1969 amendment, which limited covered writings to original or original counterparts, was to exclude photocopies and "include only original documents." Wisner, *supra* at 307.

The bank relies upon language of the clause that states "[m]echanically reproduced facsimile signatures are treated the same as handwritten signatures." Since the signature on the photocopy was mechanically reproduced, it argues that the whole agreement falls within the definition. However, this provision is not a part of the definition of "securities, documents or other written instruments" which refers to original or original counterparts. The only reference to "signatures" within the definition concerns carbon impressions of signatures on copies of bills of lading, which are not

1. At oral argument the bank cited *First Nat'l Bank v. Aetna Cas. & Sur. Co.*, 610 F.2d 424 (6th Cir.1979), as further support for its interpretation of the language in "Clause (E)." However, that case is also distinguishable for the same reason.

involved here. In any event, even if this language did refer to the definition, it refers only to signatures and not to the entire document; it would not satisfy the requirement that the rest of the document be "original."

III. *The loan exclusion under the bond.*

The bond provides no coverage for losses sustained as the result of bad loans:

This bond does not cover:

. . . . .

(e) loss resulting from the complete or partial non-payment of, or default upon,

(1) any loan or transaction in the nature of, or amounting to, a loan made by or obtained from the Insured, . . . .

While we do not believe an insurer could rely upon this exclusion in every case in which a pre-existing loan was renewed on the strength of a forged or altered instrument, we believe it applies here and provides further support for the trial court's disposition. The exclusion is applicable because the bank failed to show that its loss was the result of the alteration of the document, and not due to the loans already in default. It resolves basically into an issue of causation. We believe the evidence supports the trial court's finding that the bad loans, not the alteration, were the cause of the bank's loss and that the bad loan exclusion was therefore properly applied.

We find no error in the trial court's disposition of the case and therefore affirm.

AFFIRMED.

All Justices concur except ALLBEE, J., who takes no part.